#28294-aff in pt, rev in pt & rem-MES
**2018 S.D. 74**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JENNIFER L. HILLER,                              Plaintiff and Appellee,

    v.

JAMES D. HILLER,                                 Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
MOODY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE VINCENT A. FOLEY
Retired Judge

* * * *

STACY F. KOOISTRA
SHARLA B. SVENNES of
Myers Billion, LLP
Sioux Falls, South Dakota                        Attorneys for plaintiff
                                                 and appellee.


KENNETH M. TSCHETTER of
Tschetter & Adams Law Office, P.C.
Sioux Falls, South Dakota                        Attorneys for defendant
                                                 and appellant.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 27, 2018
OPINION FILED **10/24/18**

#28294

SALTER, Justice

[¶1.] After finding James Hiller in contempt for violating the provisions of a visitation order, the circuit court ordered James to pay attorney fees incurred by his former spouse, Jennifer Hiller. In an ensuing proceeding to change custody, the court ordered James to pay additional attorney fees to Jennifer along with expert witness fees. James appeals both orders. We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[¶2.] James and Jennifer were divorced in 2013 following a court trial.[1] One area of evidence developed during the trial concerned Jennifer's relationship with Wayne Lloyd, a family friend who was also a registered sex offender because of his 1994 conviction for raping a 15-year-old girl. The court's original custody determination granted the parties joint legal and physical custody of their two minor children, S.H. and T.H. However, the court required the presence of another adult whenever Lloyd was around the children.

[¶3.] At some point after the divorce, Jennifer began dating Lloyd, and in November of 2013, she filed a motion to lift the supervision requirement. At the hearing, James testified that S.H. was uncomfortable being around Lloyd. The court found Lloyd posed a risk to S.H. because she was similar in age to Lloyd's rape victim and could be susceptible to manipulation. The court refused to lift the

---

1. This Court decided an earlier appeal involving the parties, relating principally to the circuit court's equitable division of property. *Hiller v. Hiller*, 2015 S.D. 58, 866 N.W.2d 536.

supervision requirement as to S.H and also denied James's oral motion to modify the custody order to prohibit Lloyd from being present when S.H. stayed overnight with Jennifer.[2]

[¶4.]     In March of 2015, Jennifer announced her plan to move in with Lloyd. S.H., who was then 15 years old, refused to attend visitation with her mother, and both parties sought court intervention.  The circuit court ordered the parents to participate in a custody evaluation with Shanna Moke.  The court also ordered an interim visitation schedule that allowed Jennifer two evenings per week with S.H. but required that Lloyd not be present.  S.H. attended these visits with Jennifer. The court further ordered Jennifer and S.H. to attend family counseling.

[¶5.]     When Jennifer ultimately moved in with Lloyd in August of 2015, S.H. continued her refusal to attend visits, prompting James to seek to modify visitation. However, the parents entered into a visitation agreement based upon Moke's recommendations.  The circuit court entered an order in December of 2015 consistent with the parties' agreement.  The order established a two-week transition period during which Lloyd would not be present for visits between Jennifer and S.H., followed by visits at Jennifer's home where Lloyd could be present.  The order required James to transport S.H. to Jennifer's residence and continued the supervision condition for contact between S.H. and Lloyd.  Finally, the order required Jennifer and S.H. to attend counseling with Dr. Gretchen Hartmann and

---

2.     The court lifted the restriction as to T.H., concluding Lloyd was not a danger to him.

imposed an additional obligation upon James to "become involved in therapy upon Ms. Hartmann's direction."

[¶6.]     S.H. attended the initial scheduled visitations with Jennifer. However, during a visit on November 19, 2015, S.H. attempted to leave because Lloyd had arrived. S.H. refused to attend future visits.

[¶7.]     On December 28, 2015, Jennifer filed a motion asking the circuit court to find James in contempt. She alleged that James willfully disregarded the visitation order by refusing to discipline S.H. for not attending visits, by failing to bring S.H. to visits, and by alienating S.H. Jennifer also claimed James had indicated he would refuse to follow the visitation order because he disagreed with the provision allowing Lloyd to be present.

[¶8.]     At a hearing on January 7, 2016, Dr. Hartmann testified that her counseling sessions with James, Jennifer, and S.H. led her to conclude James was alienating S.H. from Jennifer. Although James said he wanted S.H. to have a relationship with Jennifer, Dr. Hartmann noted he refused to impose any consequences on S.H. if she refused to visit Jennifer. Dr. Hartmann opined that James's failure to assure these consequences resulted in parental alienation and subverted Jennifer's authority. In Dr. Hartmann's view, this type of parental alienation would severely damage the parent-child relationship. She further expressed her belief that the problem was not about Lloyd, but rather "the conflict and the disagreement between the parents." The circuit court did not rule on Jennifer's contempt motion. Instead, it emphasized to James the need to comply with the December 2015 order regardless of S.H.'s view of Lloyd.

[¶9.]     During a second hearing in February, Dr. Hartmann testified that James was still not attempting to enforce consequences for S.H.'s conduct. She opined that parental alienation was still present and that court-ordered family reunification therapy would not work until James started to facilitate visitation. James testified that he encouraged S.H. to see Jennifer but that he would not force her to go because she was afraid of Lloyd.

[¶10.]    At the conclusion of the hearing, the circuit court found James in contempt. The court found that James was "a passive/aggressive liar in these proceedings[.]" In that regard, the court observed that James was "just happy to . . . say [S.H.] should do something" but then not enforce the directive. The court considered James's testimony "incredibly deceitful." It further assessed Dr. Hartmann's testimony as "incredibly credible" and determined Jennifer's testimony was "biased, yet credible."

[¶11.]    The court entered written findings of fact consistent with its oral findings. The court found that James knew of the December 2015 order, that he had the ability to comply with it, and that he disregarded its provisions when "he failed to enforce the [c]ourt's Order for the ordered January visitation." As a consequence, the court ordered James to prepare and deliver to the court a quitclaim deed for an undivided 1/64th interest in a parcel of his farmland. The court also directed James to pay Jennifer $4,082 in reasonable attorney fees incurred by "her having to bring this action."

[¶12.]    James later asked the court to reconsider the sanction requiring him to execute and deliver a quitclaim deed for a portion of his farm property. However,

James did not ask the court to reconsider its finding of contempt for failing to comply with the court's order. In fact, he candidly stated, "With the benefit of hindsight, [James's] non-compliance with the [c]ourt's parenting time order should be somewhat mitigated, although certainly not excused." Jennifer did not object to the court removing the quitclaim deed provision.

[¶13.]     In an amended judgment of contempt, the circuit court removed the requirement that James deliver a quitclaim deed. The amended order left intact the requirement that James pay Jennifer's attorney fees incurred in bringing the contempt action and provided that James could "purge" himself of contempt by paying the attorney fees. However, there was no provision that allowed James a means to avoid paying the attorney fees by complying with the visitation order. In fact, the amended order did not include any provision to compel compliance with the underlying order. Nor did the court's amended order cite statutory support for the award of fees.

[¶14.]     At roughly the same time as the contempt proceedings, Jennifer filed a motion to change custody. The circuit court conducted an evidentiary hearing in July of 2016, at which Dr. Hartmann, Moke, and S.H.'s counselor testified. Moke and Dr. Hartmann presented conflicting expert opinions. Dr. Hartmann reiterated her opinions relating to what she described as ongoing parental alienation. Moke, however, disagreed and testified that she and Dr. Hartmann had erroneously focused on forcing S.H. to be around Lloyd. In Moke's view, Lloyd should not be present for S.H.'s visits with Jennifer.

[¶15.]     The circuit court denied Jennifer's motion to modify custody. Instead, it implemented an immersion plan under which S.H. would live with Jennifer for six weeks without Lloyd present and without visitation with James. The court further ordered that after the immersion period, S.H. would have the autonomy to choose with which parent to live. In the court's frank assessment, "Unless and until [S.H.] accepts Mr. Lloyd, she will likely spend most of her nights at [James's] residence."

[¶16.]     Jennifer subsequently moved for an award of attorney fees related to the motion to change custody. She also sought an order requiring James to pay Dr. Hartmann's expert witness fees incurred in connection with the July hearing. James resisted, arguing, among other things, that he was unable to pay because his net worth consisted largely of illiquid assets, leaving him with a poor cash position.

[¶17.]     The court granted both of Jennifer's requests. It ordered James to pay Jennifer $11,493.48 in attorney fees pursuant to SDCL 15-17-38 and also held James solely responsible for Dr. Hartmann's expert witness fees of $4,364.54.

[¶18.]     James appeals and raises the following issues for review:

   1.    Whether the circuit court clearly erred in finding James in contempt.

   2.    Whether the circuit court abused its discretion in awarding attorney fees incurred in the contempt action.

   3.    Whether the circuit court abused its discretion in awarding Jennifer attorney fees and in ordering that James pay Dr. Hartmann's expert witness fees related to Jennifer's motion to change custody.

## Standard of Review

[¶19.]     Matters of judicial discretion, such as an award of attorney fees or the court's remedy for contempt, are reviewed for an abuse of discretion. *Brosnan v. Brosnan*, 2013 S.D. 81, ¶ 12, 840 N.W.2d 240, 246 (attorney fees); *Sazama v. State ex rel. Muilenberg*, 2007 S.D. 17, ¶ 9, 729 N.W.2d 335, 340 (contempt). An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary and unreasonable." *Thurman v. CUNA Mut. Ins. Soc'y*, 2013 S.D. 63, ¶ 11, 836 N.W.2d 611, 616. Findings of fact are reviewed for clear error and will only be overturned "when we are definitely and firmly convinced a mistake has been made." *Lakota Cmty. Homes, Inc. v. Randall*, 2004 S.D. 16, ¶ 9, 675 N.W.2d 437, 440.

## Analysis and Decision

*1.     Whether the circuit court clearly erred in finding James in contempt.*

[¶20.]     A court's common law contempt power includes two distinct varieties— civil contempt and criminal contempt. *Sazama*, 2007 S.D. 17, ¶ 23, 729 N.W.2d at 344. The civil contempt power is designed "to force a party 'to comply with orders and decrees issued by a court in a civil action[.]'" *Id.* (quoting *Wold Family Farms, Inc. v. Heartland Organic Foods, Inc.*, 2003 S.D. 45, ¶ 14, 661 N.W.2d 719, 723). For this reason, civil contempt is coercive in nature. "[I]t seeks to compel 'the person to act in accordance with the court's order,' rather than to punish for past conduct." *Id.* (quoting *Wold Family Farms*, 2003 S.D. 45, ¶ 14, 661 N.W.2d at 723). "The required elements for a finding of civil contempt are[:] (1) the existence of an order; (2) knowledge of the order; (3) ability to comply with the order; and (4) willful

or contumacious disobedience of the order." *Keller v. Keller*, 2003 S.D. 36, ¶ 9, 660 N.W.2d 619, 622 (quoting *Harksen v. Peska*, 2001 S.D. 75, ¶ 12, 630 N.W.2d 98, 101).

[¶21.]    Here, James challenges the circuit court's determination that he had the ability to comply with the visitation order, arguing that S.H. was a strong-willed teenager who unilaterally refused to attend visitation. Though James testified that he was unable to physically force S.H. to attend visits when Lloyd was present, the circuit court's focus was less upon the actual act of transporting S.H. to her mother's home and more upon the parental effort necessary to prepare S.H. for the transition plan James had already developed with Jennifer. In this regard, the circuit court accepted Dr. Hartmann's view that the brinkmanship associated with getting S.H. to go to the visits may have been obviated had James effectively communicated the plan to S.H., stressed his assent, and warned of consequences should she disobey. The court also assessed James's credibility, referring to him as a "passive/aggressive liar." In the court's view, James was duplicitous and had the ability to comply with the stipulated visitation order.

[¶22.]    Although James disagrees with the disposition of the facts by the circuit court, our standard of review reflects both the primacy of the court's fact-finding role and our inclination to reverse only those findings that are clearly erroneous. *See McCollam v. Cahill*, 2009 S.D. 34, ¶ 6, 766 N.W.2d 171, 174. In this regard, "[t]he credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the circuit court and we give due regard to the circuit court's opportunity to observe the witnesses and the

evidence." *Id.* From our review, James has not established the existence of clear error.

> 2. *Whether the circuit court abused its discretion in awarding attorney fees incurred in the contempt action.*

[¶23.] Before we address the substance of James's argument, it is helpful to contrast criminal contempt from civil contempt. Unlike civil contempt, criminal contempt arises from conduct or acts committed in the court's presence "that serve to 'subvert, embarrass, or prevent the administration of justice.'" *Sazama*, 2007 S.D. 17, ¶ 24, 729 N.W.2d at 344 (quoting *Wold Family Farms*, 2003 S.D. 45, ¶ 14, 661 N.W.2d at 723). Following a determination of criminal contempt, a court may impose "sanctions that serve to *punish* the contemnor for a past transgression against the authority or dignity of the court." *Id.* (emphasis added). Both types of contempt can evoke stern responses from a circuit court, but because of the overarching premium upon compliance, a court's determination of civil contempt must also include an opportunity for a recalcitrant contemnor to purge himself of his contempt by obeying the underlying order. *Id.* ¶ 27, 729 N.W.2d at 345.

[¶24.] Here, the circuit court's contempt order, neither in its original nor amended forms, directly connects the payment of attorney fees to compliance with the underlying visitation order. James was required to pay the attorney fees without regard to his prospective compliance. Though the court indicated in its amended contempt order that James could "purge" himself of his contempt by paying Jennifer's attorney fees, there is no direct coercive means to assure compliance with the December 2015 visitation order. For this reason, the court's order seems more punitive than coercive.

[¶25.] Even so, we need not determine the precise nature of the court's contempt order or whether the common law of contempt authorized the attorney fees award. Here, James and Jennifer acknowledge the circuit court possessed statutory authority—unconnected to contempt principles—to award Jennifer attorney fees in this custody proceeding, though they differ on which of two statutes applies and the requisite corresponding analysis.

[¶26.] One source of authority for an attorney fees award is SDCL 15-17-38, which generally authorizes attorney fees in all cases of custody and visitation. An attorney fees award under this statute requires a circuit court to undertake our well-settled and detailed two-step analysis, which assesses the reasonableness and necessity of an award. *Streier v. Pike*, 2016 S.D. 71, ¶ 25, 886 N.W.2d 573, 581. In James's view, an award of attorney fees under SDCL 15-17-38 is not sustainable here because the court failed to perform the second step of the analysis—a determination of the necessity of the attorney fees.

[¶27.] For her part, Jennifer contends SDCL 25-4A-5 supports the court's award because it specifically authorizes sanctions, including attorney fees, when a court finds a party has "willfully violated or willfully failed to comply with any provision of a custody or visitation decree[.]" In her view, the circuit court was not required to engage in a standard, multi-factored assessment relating to the necessity of an award because it awarded attorney fees as a specific sanction to punish James for his willful noncompliance with a visitation order. We agree.

[¶28.] The text of SDCL 25-4A-5 allows the sanction of attorney fees for the express purpose of "punish[ing] the offender[.]" Therefore, a circuit court's findings

relating to necessity are sufficient so long as they adequately support the determination that the offending "party has willfully violated or willfully failed to comply with any provisions of a custody or visitation decree[.]" *See id.* Even though this discrete statutory authority to sanction or punish a party is, strictly speaking, unconnected to the law of contempt, the elements of civil contempt feature overlapping factual considerations. Here, for instance, the circuit court's contempt finding that James willfully "failed to comply" with the court's visitation order necessarily satisfies SDCL 25-4A-5's statutory requirement of willful violation or noncompliance with the provisions of a visitation order.

[¶29.]        Nevertheless, James asserts the attorney fees award is infirm because the circuit court "did not give any analysis or give the required consideration to the financial information of each party." However, given the specific purpose underlying the statutory authority of SDCL 25-4A-5, an inquiry into a party's relative worth, income, or liquidity is not required or relevant to this analysis. This approach is consistent with other cases in which we have upheld an award of attorney fees as a sanction imposed pursuant to statutes or rules. *See, e.g., Coloni v. Coloni*, 2017 S.D. 66, ¶ 10, 903 N.W.2d 745, 748 (affirming attorney fees award pursuant to SDCL 15-6-37(a)(4)(A) where circuit court's findings "sufficiently justified the imposed sanctions"); *Hobart v. Ferebee*, 2009 S.D. 101, ¶ 28, 776 N.W.2d 67, 75 (affirming attorney fees award for frivolous or malicious filing under SDCL 15-17-51 where circuit court's findings detailed conduct of party who persisted in advancing legal arguments that had been previously rejected).

[¶30.]    Of course, an attorney fees award under SDCL 25-4A-5(2) must still be reasonable.  In addition to our precedent that requires this determination, the text of SDCL 25-4A-5(2) limits an attorney fees award to "reasonable attorney's fees incurred as a result of the noncompliance[.]"  In this case, the court was keenly aware of the complex and contentious nature of this case.  It considered the "significant management of the communications[,]" the "deep history of the dispute[,]" the necessity for an ongoing review of the relationship, the "litigious nature of the parties" caused by James's behavior, and the "unique circumstances of this case on the legal issue of contempt."  The court concluded that $4,082 was not excessive.  From our review, the record supports the court's decision to exercise its discretion and sanction James $4,082 for his failure to comply with the terms of the visitation order.  *See* SDCL 25-4A-5.

> 3. *Whether the circuit court abused its discretion in awarding Jennifer's attorney fees and in ordering that James pay Dr. Hartmann's expert witness fees related to Jennifer's motion to change custody.*

[¶31.]    Attorney fees may only be awarded by agreement of the parties or when specifically authorized by statute.  *Center of Life Church v. Nelson*, 2018 S.D. 42, ¶ 34, 913 N.W.2d 105, 114.  The parties agree that the circuit court had authority to award attorney fees under SDCL 15-17-38 and that the court was required to engage in the detailed two-step analysis before granting such an award.  The parties have divergent views, however, as to the efficacy of the circuit court's findings in this regard.

[¶32.]    It is well settled that the circuit court must examine both the reasonableness and necessity of an award of attorney fees:

> First, the court must determine what constitutes a reasonable attorney's fee. This requires consideration of[:] (1) the amount and value of the property involved, (2) the intricacy and importance of the litigation, (3) the labor and time involved, (4) the skill required to draw the pleadings and try the case, (5) the discovery utilized, (6) whether there were complicated legal problems, (7) the time required for the trial, and (8) whether briefs were required. Second, it must determine the necessity for such fee. That is, what portion of that fee, if any, should be allowed as costs to be paid by the opposing party. This requires consideration of the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case.

*Streier*, 2016 S.D. 71, ¶ 25, 886 N.W.2d at 581 (quoting *Nickles v. Nickles*, 2015 S.D. 40, ¶ 34, 865 N.W.2d 142, 154).

[¶33.]     In its analysis of the reasonableness of the award, the court emphasized that James increased the time, labor, and skill necessary to prepare for the custody hearing, that he "complicated the nature of the legal problems," and that he "unreasonably increased the time spent" on the case. *See id.* (listing factors). James, however, contends the court clearly erred when it determined that his actions resulted in parental alienation that unnecessarily complicated the case. He further claims the court incorrectly "blamed" James for the visitation problems between S.H. and Jennifer.

[¶34.]     From our review, the record sufficiently supports the circuit court's findings. Dr. Hartmann and Moke offered differing opinions regarding the existence of parental alienation, and the court simply chose to believe Dr. Hartmann's testimony that James's actions alienated S.H. and severely damaged Jennifer's relationship with S.H. The court was also able to observe James's demeanor and weigh his testimony before concluding that James's conduct

necessitated an attorney fees award. It was within the province of the circuit court, as the trier of fact, to accept one expert's opinions over another's and to judge the credibility of the witnesses and the weight to be given to their testimony. *McCollam*, 2009 S.D. 34, ¶ 6, 766 N.W.2d at 174.

[¶35.] James also argues that the circuit court failed to adequately address the second inquiry—the necessity of an award. He contends the circuit court ignored evidence he claims indicated his inability to pay Jennifer's attorney fees. Although the circuit court did not enter detailed findings in this regard, the court noted that the parties' net worth, income, and liquidity were established by the record. The broad and spare nature of this finding should be tempered with the fact that the circuit court engaged in a discussion with James and his counsel on the record about James's financial situation. Under the circumstances, we cannot say the circuit court failed to consider James's net worth, income, and liquidity. *See Toft v. Toft*, 2006 S.D. 91, ¶ 12, 723 N.W.2d 546, 550 (quoting *Swanson & Youngdale, Inc. v. Seagrave Corp.*, 561 F.2d 171, 173 (8th Cir. 1977) (noting that specific findings are not required when "the record itself sufficiently informs the court of the basis for the trial court's decision on the material issue")). In light of this record, James has not established that the $11,493.48 attorney fees award was an abuse of discretion.

[¶36.] However, we conclude the circuit court abused its discretion when it ordered James to pay Dr. Hartmann's expert witness fees incurred in connection with the July 8, 2016 hearing. Under SDCL 15-17-37, "[t]he *prevailing party* in a civil action or special proceeding may recover expenditures necessarily incurred in

gathering and procuring evidence or bringing the matter to trial. Such expenditures include costs of . . . court appointed experts[.]" (Emphasis added.) "The prevailing party is the party in whose favor the decision or verdict is or should be rendered and judgment entered." *Crisman v. Determan Chiropractic, Inc.*, 2004 S.D. 103, ¶ 23, 687 N.W.2d 507, 513. We review a court's determination that a party prevailed for an abuse of discretion. *Id.*

[¶37.]    Here, Jennifer filed a motion for full custody of S.H. with the view that Lloyd would be present in the same home. Dr. Hartmann testified in support of Jennifer's motion, and Moke testified in opposition. Although the court discounted Moke's testimony and favored Dr. Hartmann's suggestion of an immersion plan, the court ultimately denied Jennifer's motion to change custody. Under the court's immersion plan and its order, neither Jennifer nor James truly prevailed as partisans. Indeed, the court's order directed that upon conclusion of the immersion period, S.H. would make her own visitation decisions. Because Jennifer did not prevail, she was not entitled to recover Dr. Hartmann's fees under SDCL 15-17-37, and we need not address James's claim that Dr. Hartmann did not testify in her capacity as a court-appointed expert.

> 4. *Appellate Attorney Fees.*

[¶38.]    James and Jennifer separately request an award of appellate attorney fees. We decline to award fees to either party.

[¶39.]    Affirmed in part, reversed in part, and remanded.

[¶40.]    GILBERTSON, Chief Justice, and ZINTER, KERN, and JENSEN, Justices, concur.